IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT MORALES, ANGELA K. MORALES,
BRANDON R. MORALES, MARY ANN MORALES,
and TATE W. MORALES,

    Plaintiffs,

vs.                 No. CIV-04-558  JB/WDS

E.D. ETNYRE & CO.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant E.D. Etnyre & Co.'s Motion to Prohibit the Opinion Testimony of Robert Puschinsky, P.E., Based Upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and Motion for Summary Judgment, filed January 21, 2005 (Doc. 55).  The Court held a hearing on this motion on February 24, 2005.  The primary issues are: (i) whether Puschinsky's testimony is relevant and reliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); and (ii) whether, if Puschinsky's testimony is not relevant and reliable, the Court should enter summary judgment for Defendant E.D. Etnyre & Co. ("Etnyre") .   Because the Court determines that Puschinsky's testimony meets Daubert v. Merrell Dow Pharmaceuticals, Inc.'s standards for the Plaintiffs' claims of negligent and/or defective design, the Court will deny Etnyre's motion in part, but will grant the motion as to the Plaintiffs' other claims.

## FACTUAL BACKGROUND

On or about June 20, 2003, hot asphalt severely burned Plaintiff Robert Morales while he was operating an asphalt black topper road machine, model BT-HS, serial No. J-8367 ("Black Topper").

Etnyre manufactured the Black Topper and Defendant Road Machinery Company, Inc. ("Road Machinery") distributed it.  Robert Morales, along with his wife, Angela K. Morales, and his children, Brandon R. Morales, Mary Ann Morales, and Tate W. Morales, filed suit against Etnyre, Road Machinery, and John Does 1-10.[1]

## PROCEDURAL BACKGROUND

### 1.    The Complaint and Discovery.

On April 7, 2004, the Plaintiffs filed their Complaint for Personal Injuries against Etnyre and Road Machinery in negligence and strict liability for the design, manufacture, sale, maintenance, distribution, and marketing of the Black Topper.  The Plaintiffs' Complaint contains three counts against the Defendants: negligence, strict product liability, and a claim for punitive damages.  See Complaint ¶¶ 8, 10, and 12.  The Initial Pretrial Report established a deadline of September 15, 2004 for the Plaintiff's disclosure of expert witnesses.

Pursuant to this deadline, the Plaintiffs retained and identified Puschinsky as their expert witness regarding the allegedly defective Black Topper.  The Plaintiffs retained Puschinsky to assist the jury's understanding of their claims of product liability and negligence against the Defendants. The Plaintiffs have produced Puschinsky's four reports in discovery containing his opinions in this case.  See Puschinsky's January 8, 2004 Report; Puschinsky's July 8, 2004 Report; Puschinsky's September 29, 2004 Report; Puschinsky's October 7, 2004 Report.

Defense counsel took Puschinsky's deposition on October 8, 2004 and questioned him about

---

[1] On February 28, 2005, the Plaintiffs settled the claims against Road Machinery Company. See  Clerk's Minutes Regarding Rule 16 Settlement Conference, filed March 1, 2005 (Doc. 90).  On April 4, 2005, the Court dismissed with prejudice all claims against Road Machinery Company.  See Order of Dismissal with Prejudice, filed April 4, 2005 (Doc. 93).

his reports.   Etnyre contends that, in his deposition, Puschinsky stated that his opinions, as offered at his deposition, were final opinions.  See Deposition of Bob Puschinsky at 155:7-17, taken October 8, 2004 (hereinafter "Puschinsky Depo.").  The transcript of the deposition, however, shows that Puschinsky stated:

> Q.  Okay.   Now, let me go back to my question, though.  Do you have any other opinions not previously discussed here today and not contained in your report?
>
> A.  Not at this moment.

Id.

After that date, twenty depositions were taken, nine of which the Defendants took.  Discovery in this matter ended on December 15, 2004.  The Court did not set a time limit by which the parties had to file their Daubert motions.

In response to this motion, Puschinsky submitted an affidavit stating: (i) the Black Topper "is a very simple miniature processing plant on wheels;" (ii) his experience in refining and chemical plants is directly related to a Black Topper; (iii) the operations and maintenance manual requires the use of diesel fuel to clean the Black Topper, a fact that Etnyre disputes; and (iv) the operations and maintenance manual is deficient because it does not inform the user how many times to clean the Black Topper with diesel fuel.  See Puschinsky's Aff. at ¶ 11, at 3-4.

### 2.   Puschinsky's Qualifications.

Puschinsky's formal education consists of a Bachelor's Degree in Aeronautical Engineering. See Curriculum Vitae of Roberty W. Puschinsky at 2 (hereinafter "Puschinsky C.V.").  Puschinsky earned his degree in 1957 after studying five years at the University of Minnesota.  See id. Puschinsky is registered as a Professional Engineer in the State of Texas.  See id.

Amoco Oil Co. employed Puschinsky for seventeen years, from 1974 to 1991, as a Maintenance Engineer, Maintenance Superintendent, Process Superintendent, and Operations Superintendent.  See id. at 1-2.  He was working at, and part of the time, in charge of, one of the largest refineries and processing plants in Texas.  Puschinsky worked in Amoco's Texas City refinery, last working as the Operations Superintendent for its Acid and Alkylation Plant.  See Puschinsky Depo. at 36:2-3; Puschinsky's C.V. at 2-3.

At Amoco, Puschinsky's experience involved responsibilities that relate to his expertise in this case, including: (i) working as a maintenance engineer; (ii) performing inspections of equipment failures; (iii) specifying repairs; (iv) designing failure avoidance improvements; and (v) supervising the proper training of employees to make sure jobs were carried out safely.  See Puschinsky's C.V. at 2.  While employed with Amoco, Puschinsky worked with trucks, such as vacuum trucks, which have similar functions and parts as the Black Topper that is the subject of this lawsuit.  See Puschinsky Depo. at 32:20 - 33:3.  During his time at Amoco, Puschinsky did hands-on operation of equipment during labor shortages; there were six months of union work stoppages, and Puschinsky physically operated and maintained the Ammonia and Coker Plants during 1974 and 1980.  See Puschinsky Depo. at 36:12-19; Puschinsky C.V. at 3.

Etnyre contends that Puschinsky's primary expertise is limited to consultation and litigation support in the field of gas and petrochemical refineries.  The Plaintiffs contend that his experience is broader.  Puschinsky's consultation business is primarily in the area of refining, but not chemical refining plants.  See Puschinsky Depo. at 25:1-6. Certainly Puschinsky is a consultant for major worldwide oil and chemical corporations, and assists them in enhancing the process and operation safety and performance of their plants, including process licensing. Puschinsky is a world-wide expert

-4-

in safety of processing plants.  He is also a consultant for manufacturing corporations.  See Puschinsky C.V. at 2.

Puschinsky completes audits of plants for safe operation in accordance with American Petroleum Institute Recommended Practices.  These audits include safety review of design and operation of refining plants, including piping and tanks.  He has visited more than fifty refineries and chemical plants world-wide for processing and/or safety consultation or litigation support.  See id. During 2004, he conducted safe operation audits of refineries in Sasolburg, South Africa; Paris, France; Marseille, France; Schwedt, Germany; and Stanlow, England.  He is recognized as a leading expert in the processing and refinery plant field.

Road Machinery agrees that, in the field of refinery and processing plants, Puschinsky is an expert.  Puschinsky is not, however, a safety engineer.  Puschinsky has nonetheless worked on safety matters in a way similar to that a designated safety engineer would.  He has been involved with safety issues his entire engineering career of more than forty-five years.  See Puschinsky Aff. ¶ 5, at 1-2. Thus, it is fair to say that Puschinsky has experience in safety engineering.

He also worked as a Navy engineer.  In addition, while working at McDonnell-Douglas, he was the engineer advisor on three space missions.  See Puschinsky's C.V. at 3.

Puschinsky has taught courses in product safety and given seminars for corporations such as Phillips Petroleum Co., DuPont, and Allied Signal Corp.  See Puschinsky Depo. at 31:19 - 32:4. Puschinsky is a significant contributor to and panel member for Phillips World-Wide HF Alkylation symposia.  See Puschinsky's C.V. at 2.  He has provided the Honeywell Corporation's HF Alkylation advisory service for its North American customers and has visited many refineries in this capacity. See id.  Puschinsky is a certified instructor in hazard analysis techniques.  See id.

Puschinsky is not a published author in subjects related to his field.  See Puschinsky Depo. at 25:21-25.  Puschinsky has, however, been a contributor to items published in his field.  Puschinsky has been a contributor to several publications of the American Petroleum Institute, and has developed and presented a seminar for industry through that same Institute.  See id. at 25:21 - 26:25; Puschinsky's C.V. at 2.  His contributions include articles defining safe operations in plants, about how to perform safety studies, about the meaning of the Code of Federal Regulations, and about how an industry responds to a specific regulation.  These articles were published in Refining Today, Oil and Gas Journal, EPA studies by the federal government, and American Petroleum Institute editions of recommended practices that set industry standards.  See id.

As further proof of Puschinsky's recognition as a national expert in accident investigation and safe procedures in refineries and processing plaints,  Puschinsky has been an invited contributor to the Report to Congress on the EPA Hydrogen Fluoride Study and has been a contributor to several industry magazine articles.  See Puschinsky's C.V. at 2.  Puschinsky is an investigating consultant and retained expert for the U.S. Chemical Safety and Hazard Board, an independent federal agency that the Clean Air Act Amendments of 1990 established to determine the probable causes of incidents, to issue safety recommendations, and to study chemical issues.  See Puschinsky Depo. at 21, 23; Puschinsky's C.V. at 21:19-25.

Puschinsky has not been a member of any professional organizations.  See Puschinsky Depo. at 30:7-15.  Puschinsky has not worked as a distributor of industrial or construction equipment.  See id. at 130:18-22.

Puschinsky has been an expert in litigation in Texas.  Puschinsky has testified one time in court as an expert on refining plant operations and has provided deposition testimony regarding

refining plant operations.  See id. at 19:21 - 20:2; id. at 23:7 - 24:10.  In the one case where he testified at trial, he was on the witness stand for six days.  See id. at 14:24 - 15:1.

Puschinsky has given other deposition testimony, including a case in the United States District Court for the District of New Mexico that involved a gas explosion in a pipeline that was not within a refinery.  See id. at 12:21 - 13:18.  The listing of the eleven cases where he has been an expert shows that leading plaintiffs' and defense firms have retained him, with a 40%/60% split.  See Puschinsky's C.V. at 2.

### 3.     Puschinsky's Experience with Asphalt Distributors.

The first time that Puschinsky became aware of a distributor truck was in August of 2003. Puschinsky has not been involved in the design of any part of any oil/asphalt distributor truck, including the Etnyre model.  See Puschinsky Depo. at 38:8-14.  Puschinsky has not looked at competitors' models to Etnyre's distributor.  See id. at 66:11-16.

The closest experience that Puschinsky has had with trucks were those that involved vacuum trucks used to suck sewage out of septic tanks, but he never personally operated such a vehicle.  See id. at 32:20 - 33:12.  On the other hand, Puschinsky has had experience with teaching seminars throughout the country on process safety in refinery and processing facilities; Puschinsky is a world-wide expert on safety in processing and refinery plants, performing safety audits at such plants in South Africa, France, Germany, and England during 2004.  See Puschinsky Aff. at ¶ 8, at 2.  In his affidavit, he describes the Black Topper as a miniature processing plant on wheels.  See id. at ¶ 3, at 1.

### 4.     Puschinsky's Methodology.

Puschinsky's only experience with the asphalt distributor machine is two visits he made to

observe it, once on August 28, 2003, and once on January 7, 2004.  See Puschinski Depo. at 32:5-19.

Puschinski testified:

> Q.  Going back then to this -- to these distributor trucks, the type of which is
>
> involved in this case, is it fair to say that prior to August 27th of 2003 you had no
>
> familiarity with the specific trucks that we're talking about?
>
> A.  Not familiar with the Etnyre model of whatever truck, that's for sure, that's
>
> correct.

Id. at 36:20 - 37:1.  On August 28, 2003, Puschinsky examined the Black Topper for about an hour,

but not "in any serious manner."  See id. at 42:8-24.

On January 7, 2004, Puschinsky looked at the machine "to the extent that anyone could look

at it without dismantling it;" it was intact and covered with oil, and one could not read the

information on the machine concerning the valves and equipment.  See id. at 46:3-10.  Puschinsky

also had the operating manual before his deposition, so he knew how the Black Topper, including the

valves and equipment, operated.  See Puschinsky Aff. ¶ 10, at 3.

Puschinsky has not reviewed communications between Etnyre and the City of Hobbs

regarding the Black Topper.  See Puschinsky Depo. at 128:7-9.  Puschinsky does not know how or

when Etnyre sold the Black Topper to the City of Hobbs.  See id. at 126:6-24.

Puschinsky lacked knowledge regarding the manhole hatch design, its materials, or

specifications.  See id. at 138:9-13.  Puschinsky has not seen the manhole hatch for the distributor

after the City of Hobbs took it off the vehicle, and he has not seen the replacement manhole cover.

He has only heard a description regarding the design of the other hatch.  See id. at 150:2-9.

Before forming opinions in this case, Puschinsky did not perform any calculations to

determine what pressures existed in the distributor when it erupted hot asphalt in the accident.  See id. at 138:7-25.  Puschinsky did, however, perform calculations during his deposition with regard to the likely minimum pressure that was present in the tank at the time of the accident.  See id. at 139.

Puschinsky acquired his opinion regarding sale, distribution, and marketing of the Etnyre Black Topper by speaking with Morales about unconfirmed prior accidents and based upon the assumption that Road Machinery knew about them.  See id. at 131:13-134:11.

Puschinsky sets forth in his Affidavit the methodology that he used in arriving at his opinions:

* I began my assessment with respect to the adequacy of the design of the Black Topper by inquiring how the accident occurred.

* I spoke with Morales, who informed me that the Black Topper was used the previous day to distribute water-based emulsified oil called "prime oil."

* Based on my inspections of the Black Topper and my discussions with Mr. Morales, it was evident that the hot asphalt product as Asphalt Cement-5 oil (AC-5) used in the Black Topper the day of the accident erupted from the manhole cover due to increased pressure inside the Black Topper's tank.

* Under these circumstances, the increase in pressure was caused by the flash evaporation of water when hot AC-5 oil came into contact with water residue located inside the Black Topper's tank.

* The prime oil used in the Black Topper the day before this accident was the source of the water residue that ultimately caused the increase in pressure leading to the eruption of the hot AC-5 oil the next day.

* The Etnyre operating manual addresses the risk that water residue in the Black Topper's tank will cause an increase in pressure by instructing operators to clean out the Black Topper by circulating diesel.

* The reason that the manual instructs operators to use diesel is specifically to rid the Black Topper tank of water.

* This instruction makes no mention of the amount of diesel that should be used or

-9-

the number of times the diesel should be circulated inside the Black Topper's tank.

* My professional opinion, based on my years of specialized experience, my personal examination of the Black Topper and my understanding of how events transpired, is that in order to clean the Black Topper tank adequately, so as to avoid an eruption of hot oil, diesel must be circulated inside the Black Topper tank multiple times.

Puschinsky Aff. ¶ 11, at 3.

        **5.      Puschinsky's Opinions.**

        It is important to understand what Puschinsky's opinions are before the Court determines whether they are reliable and relevant.

                **a.      Accident.**

        In Puschinsky's opinion, the accident occurred when water and hot oil came together in the distributor, which vaporized the water, causing oil to be pushed out of the top of the distributor through a manhole. See Puschinsky's Depo. at 51:15-20.  In Puchinsky's opinion, Morales' cleaning of the machine before using it on the day of the accident was "absolutely ineffective resulting in the eruption" because water came into contact with oil, causing an eruption of product through the machine's manhole.  See id. at 79:22 - 80:3.

                **b.      Areas Where Puschinsky Did Not Find Problems or Did Not Have Opinions.**

        Puschinsky did not find any structural defect in the manhole assembly for the Etnyre distributor, and did not find any defect in material. See id. at 49:20 - 50:7; id. at 122:6-9.  Puschinsky also has no problem with the method that the operation manual recommends to clean the distributor after using latex-based product, but before using oil-based product.  See id. at 57:22 - 58:8. Puschinsky relied upon Etnyre's presumed experimentation to determine the proper procedure to clean the distributor's tank.  See id. at 59:2 - 60:25. But he could not determine, without

experimentation, the proper number of times to clean the machine before it was reused.  See id. at

59:23-60:25.  Because Puschinsky had not performed any such testing, he did not have any opinion

regarding the number of times and duration of cleaning the machine before reuse.  See id.  at 62:4-6.

### c.  Puschinsky's Expert Opinions Regarding Design Defect.

Puschinsky found defects with the Black Topper.  He determined the design to be defective

in several ways. See Puschinsky's January 8, 2004 Report at 1; Puschinsky's July 8, 2004 Report at

1- 2; Puschinsky's September 29, 2004 Report at 1-2.  In his deposition Puschinsky explained his

opinions concerning the allegedly defective design of the Black Topper and gave examples in each

instance of what a better design would have been.  These opinions and his examples of alternative safe

design are as follows:

1.    Etnyre's failure to properly design the Black Topper to prevent entry of hot oil --

more than 200 degrees --  into the tank caused the accident.  See Puschinsky's January 8, 2004

Report at 1.  He explained that it is very dangerous to load the tank without knowing whether the

tank is dry. See Puschinsky's Depo. at 90:4-25.

The alternative design would have included a temperature control valve in the loading system,

of either electronic or mechanical operation, with a subpoint to control the temperature.  See id. at

86: 2-9.  The valve would open automatically, and would open and close depending on the

temperature.  See id. at 87:12-17.  Sarco and most other valve companies make such a valve.  See

id. at 87:17-19.  The valves that Puschinsky recommends are referred to as steam traps, but many

kinds of process valves would do the same job.  See id. at 87:20-22.  The valve would be placed

somewhere in the line to prevent oil from getting into the tank until the operator is ready for it.  See

id. at 87:23-25.

2.      Etnyre's failure to properly design the Black Topper's circulation system to prevent fast entry of hot oil and its contact with the residue of previous day roadwork materials caused the accident.  See Puschinsky's July 8 Report at 1-2.  The hot oil or asphalt mixed too quickly with the water-based emulsifier left in the tank from the previous day.  See Puschinksy's Depo. at 94:1-12. There were two possible sources of water: (i) one was in the tank, which Puschinsky doubts was the case, because it was loaded with 1600 gallons and nothing happened; and (ii) the more probable source is the circulating bar.  See id. at 94:6-12.

As the inside valve was opened, the water in the circulating bar was pushed into the tank, instantly mixing with the oil in the hot asphalt, and it exploded.  See id. at 95:8-9.  Because the operator cannot completely cure that problem by partially filling the tank, the operator should first insert the asphalt or other material being used at less than 200 degrees and then slowly release the actual hot product by use of a circulation system.  See id. at 95:19 - 96:23.  Because this accident occurred when the inside valve was opened, Etnyre should have used an inside valve with an operating characteristic that opens up very slowly instead of a valve where a quarter turn may open the valve entirely.  See id. at 96:23 - 97:8.

This particular valve is specified by its operating and flow characteristics.  See id. at 97:9 - 99:4.  It could be a ball, globe, gate, quarter turn, or butterfly valve with a very slow passage of liquid at the beginning.  See id.  The valve should be designed so that it would not allow more water to travel from the circulating bar into the tank of hot oil.  See id.  It could be designed to flow one ounce per minute.  See id.  It would be a design encompassing cubic millimeters versus time.  See id.

3.      Etnyre failed to properly design the Black Topper to avoid mixing hot oil with the residue of the previous day road-work materials.  See Puschinsky's January 8, 2004 Report at 1;

-12-

Puschinsky's July 8, 2004 Report at 1; Puschinsky's September 29, 2004 Report at 1.  This defect is not the same as defect No. 2, <u>supra</u>, because here, there should be no mixing of the materials at all. <u>See</u> Puschinsky's Depo. at 101:17-25.  Etnyre could have avoided this design failure by installing a way to visualize the quantity of anything in the tank.  <u>See id.</u> at 101:23-25.

An alternative safe design would be to install a measuring device so that one could see what liquid is left in the tank.  <u>See id.</u> at 102:2-6 .  This design could involve instrumentation to measure the material left in the tank or by making it possible for the operator to conduct a visual examination. <u>See id.</u> at 102:2 - 104:24.  One example would be to open the bottom of the tank so that the operator can look at it and see that the pressure relief vent is not plugged and is wide open.  <u>See id.</u> at 102:1-3. A small valve of one to two inches is not sufficient.  <u>See id.</u> at 102:4-5.  The distributor needs something big enough so that the operator can see inside the tank and determine whether all the liquid has been removed.  <u>See id.</u> at 102:5-7.

Puschinsky opines that one way to accomplish this design goal would be to put a hatch on the bottom of the tank.  <u>See id.</u> at 102:1-3.  That design may not be the best, but the design must address this problem.

4.      Etnyre's failure to properly design the Black Topper to provide an adequate tank venting system capable of handling steam eruption pressure.  <u>See</u> Puschinksy's January 8, 2004 Report at 1.

Puschinsky gave two examples of how to relieve the pressure. One example is a relief system, and the other is a venting system.  <u>See</u> Puschinsky Depo. at 113:19-21.  The relief system in place on the Black Topper was the hatch or manhole cover.  <u>See id.</u> at 113:19-24.  Pushchinsky does not believe that Etnyre's system is an acceptable relief system, because it puts the oil where it cannot be

tolerated.  See id. at 113:24 - 114:1.  The current system relieves the pressure, but it does not perform the safety relief function.  See id. at 114:8-15.

At Puschinsky's deposition, the Defendants' counsel did not ask for any design alternatives concerning this design flaw.  See id. at 114:5-15.

5.      Etnyre's failure to properly design the Black Topper to avoid incomplete tank cleaning, which led to a failure of the tank venting system to relieve steam eruption pressure, caused the accident.  See id. at 114:23 - 115:2; Puschinksky's September 29, 2004 Report at 2 ("avoid incomplete drainage of previous day road work materials and tank cleaning materials residue").  Here Puschinsky is referring to the pressure relief vent system being plugged.

An alternative design would have been to permit the pressure relief system to be designed with a test feature so that the operator can always know that the pressure relief vent system is open.  See Puschinsky Depo. at 115:13-15.  The Defendants' counsel did not ask for any specific examples concerning this design. See id. at 114-115.

6.      Etnyre failed to design the Black Topper to provide operator protection from erupting hot road oil.  See Puschinsky's September 29, 2004 Report at 2 ("provide operator protection from erupting hot road oil").  Because Etnyre put the control for the inside valve on the back upper portion of the tank, it required the operator to be directly in the path of any hot oil that erupted through the manhole cover.  See id.

A potential design alternative would be to put a roof over the operator station on the back of the truck and protect it so that the operator could not possibly get oil erupting from the manhole cover coming in contact with the operator at his work station.  See id. at 115:19 - 116:10.  Another design alternative would be to put all of the controls in the cab of the truck and to specify that all

-14-

controlling of the tank and the circulation bar be from inside of the cab of the truck with the windows closed. See id. A third design alternative would be to specify personal protection equipment for use with 350 degree oil. See id.

7.      Etnyre's failure to provide a manhole cover capable of withstanding steam eruption pressure caused the accident. See Puschinsky's September 29, 2004 Report at 2 ("a top oil loading hatch capable of withstanding steam erruption pressure"). This design flaw is based upon Etnyre designing the manhole cover to withstand only two to three pounds of tank pressure, while the United States Department of Transportation specifies 20 to 30 pounds of tank pressure. See id. at 117:20-22. This design flaw refers to Etnyre's failure to install on the Black Topper its newer and stronger version of the manhole cover that it developed to comply with DOT specifications. See id. at 117:20 - 118:8.

Defendants' counsel did not ask for any alternative design, and in Puschinsky's opinion, an alternative design was probably not needed. See id. at 117-118.

8.      Etnyre's failure to come up with a system that did not require the operator to stand next to the hot oil loading hatch when activating the hot oil circulation system caused the accident. See Puschinsky's September 29, 2004 Report at 2 ("avoid requiring the operator to stand next to the hot oil loading hatch when activating the hot oil circulation system"). This design flaw refers to the fact that Morales had to stand on the back of the truck to operate the inside valve, which put him directly in the path of any hot oil erupting from the manhole cover. See Puschinsky Depo. at 118:9-11.

        **d.      Design.**

Puschinsky believes that Etnyre's design of the distributor is defective, but on more than one

occasion, he testified that he was not a designer.  <u>See</u> <u>id.</u> at 89:19.  Puschinsky has, however,

designed items as an engineer.  He has designed equipment in the past.  He was awarded a patent for

processing equipment he designed.  <u>See</u> Puschinsky Aff. ¶ 5, at 1-2.

Puschinsky did not design a new distributor for this case, but he did engage in design of

certain items on the distributor.  For example, he designed mechanical equipment by specifying valves

on that equipment.  <u>See</u> Puschinsky Depo. at 86:2 - 87:22; <u>id.</u> at 97:9 - 99:4; <u>id.</u> at 146:14-20; 147:4-

8; <u>id.</u> at 152:7-8.

**6.    Etnyre's Motion to Exclude.**

Etnyre files its Motion to Exclude the Opinion Testimony of Plaintiff's Expert, Robert

Puschinsky, P.E., pursuant to rule 702 of the Federal Rules of Evidence, <u>Daubert v. Merrell Dow</u>

<u>Pharmaceuticals, Inc.</u>, and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), and its Motion for

Summary Judgment, pursuant to rule 56 of the Federal Rules of Civil Procedure.  Etnyre contends

that it is entitled to summary judgment on the Plaintiffs' remaining claims for negligent or defective

design, manufacture, marketing, sale, or distribution because: (i) the Plaintiffs did not offer any

evidence regarding negligent or defective manufacture, marketing, sale, or distribution; and (ii) the

Plaintiffs lack competent expert testimony regarding their claim for negligent or defective design

defect.  The Defendants moved for summary judgment on the Plaintiffs' claim for negligent or

defective maintenance in a separate motion, which is pending before the Court and the subject of

additional briefing on the issue of product recall.

The Plaintiffs oppose this motion.

In a hearing prior to the hearing on this  motion, the Court stated that it would not be inclined

to exclude the expert without giving the Plaintiffs an opportunity to present its witness to the Court

at an evidentiary hearing.  See Transcript of Hearing at 101:6-8 (taken February 18, 2005).[2]  The

Plaintiffs declined to present Puschinsky at the Daubert hearing.   Accordingly, the Daubert hearing

was largely legal argument regarding the sufficiency of Puschinsky's reports, deposition testimony,

and affidavit.

### STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue of

material fact, and the moving party is entitled to judgment as a matter of law.  See Celotex v. Catrett,

477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the

pleadings, but must set forth specific facts showing that there is a genuine issue for trial.   See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  An issue of fact is "genuine" if the

evidence is significantly probative or more than merely colorable such that a jury could reasonably

return a verdict for the non-moving party.  See id. at 248-50.  Mere assertions or conjecture as to

factual disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co.,

853 F.2d 768, 771-72 (10th Cir. 1988). The Court may only consider admissible evidence when ruling

on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d

1467, 1474 (10th Cir. 1985).

### LAW ON EXPERT WITNESSES

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court of the United States

held that rule 702 of the Federal Rules of Evidence allows the admission in evidence of scientific

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

evidence only if it is relevant and reliable.  See 509 U.S. at 589 (interpreting rule 702 to require that the trial court screen proffered expert testimony to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").  In Kumho Tire Co., Ltd. v. Carmichael, the Supreme Court extended the reliability and relevance requirements to all expert testimony.  See id. at 141.  After the Supreme Court's decisions in Kumho and Daubert, Congress amended rule 702 Rule 702 now provides:

> If the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining that scientific testimony is relevant and reliable, the trial court must evaluate whether the proffered expert testimony meets the following standard:

> The subject of an expert's testimony must  be "scientific . . .  knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. See, e.g., Brief for Nicolaas Bloembergen et al. as Amici Curiae 9 ("Indeed, scientists do not assert that they know what is immutably 'true' -- they are committed to searching for new, temporary, theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science et al. as Amici Curiae 7-8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 589-90 (citations and footnotes omitted).

To assist trial courts in determining whether an experts' proffered testimony met the requirement of "scientific knowledge," the Supreme Court listed a number of non-exhaustive factors that a trial court should take into consideration when evaluating an experts' proffered testimony. These factors include: (i) whether the experts' technique or theory can be or has been tested; (ii) whether the technique or theory has been subject to peer review and publication; (iii) the known or potential rate of error of the technique or theory when applied; (iv) the existence and maintenance of standards and controls; and (v) whether the technique or theory has been generally accepted in the scientific community. See id. at 593-94.

The Supreme Court in Kumho Tire Co., Ltd. v. Carmichael held:

> [A] trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

Id. at 141-42. The Supreme Court in Kumho stressed that the relevancy and reliability concerns, in addition to the Daubert factors, may also focus on personal knowledge or experience. See id. at 150 ("As the Solicitor General points out, there are many different kinds of experts, and many different kinds of expertise.").

In Bitler v. A.O. Smith, 391 F.3d 1114 (10th Cir. 2004), a gas explosion caused serious injury to the plaintiff. See id. at 1117. At issue in the case was whether the district court properly allowed two of the plaintiffs' experts to testify under the Daubert standard. See id. The Tenth Circuit held that the district court properly admitted both experts' testimony. See id.

-19-

The plaintiffs in <u>Bitler v. A.O. Smith</u> contended that a safety mechanism, designed to shut off the supply of propane gas to a hot water heater when the pilot light was not lit, failed to seal the gas in a copper feed pipe, thereby causing a gas leak.  <u>See id.</u> at 1118.  The plaintiffs' experts testified that the seal failed because sulfide particles contaminated the safety valve. <u>See id.</u>  The Tenth Circuit noted that sulfide particle contamination was a well-known hazard. <u>See id.</u>  In fact, the manufacturer of the water heater made two design changes before the accident to prevent sulfide particles from reaching the safety valve.  <u>See id.</u>  A test conducted after the explosion revealed that sulfide particles were present in the valve, but none of those detected were large enough to cause the leak.  <u>See id.</u> The plaintiffs' expert reasoned that, despite the lack of evidence from testing, the sulfide particles most likely caused the leak.  <u>See</u> id.

The defendant's in <u>Bitler v. A.O. Smith</u> challenged the plaintiffs' experts' testimony.  <u>See id.</u> at 1119.  The trial court held that the expert's testimony was relevant and reliable as required by <u>Daubert</u>. Upon review, the Tenth Circuit affirmed the district court.  The court explained that an expert's "personal experience, training, method of observation, and deductive reasoning" could be scientifically valid methodology.  <u>Id.</u> at 1122.  The circuit court also explained that rule 702 did not require expert's to test their theories.  <u>See id.</u> at  1123.

## PRODUCTS LIABILITY LAW

### 1.      Categories of Products Liability Cases.

New Mexico courts have recognized that the theory of products liability is applicable to three defects:  design, manufacturing, and marketing (warnings).  <u>See</u> <u>Smith v. Bryco Arms</u>,  2001 NMCA 90, 92, 33 P.3d 638, 643 (N.M. Ct. App. 2001); <u>Fernandez v. Ford Motor Co.</u>, 118 N.M. 100, 109, 879 P.2d 101, 110 (N.M Ct. App. 1994).

> **2.      Other Incidents.**

In <u>Black v. M & W Gear Co.</u>, 269 F.3d 1220 (10th Cir. 2001), the Tenth Circuit stated:

> [E]vidence of other accidents in a products liability suit is relevant to show notice, demonstrate the existence of a defect, or to refute the testimony of a defense witness. Before evidence of other accidents is admissible for any purpose, however, the party seeking its admission must show the circumstances surrounding the other accidents were substantially similar to the accident that is the subject of the litigation before the court.

<u>Id.</u> at 1227 (citations omitted).

> **3.      Necessity of expert testimony.**

Courts in some jurisdictions have held that expert testimony is essential to explain complex issues in product liability cases: "[L]ay jurors would tend to understand products that do not work; they are not likely to possess 'common understanding' about how products are designed." <u>Anderson v. Raymond Corporation</u>, 340 F.3d 520, 524 (8th Cir. 2003)(citing <u>Dancy v. Hyster Co.</u>, 127 F.3d 649, 653 (8th Cir. 1997)). In <u>Hochen v. Bobst Group, Inc.</u>, 290 F.3d 446 (1st Cir. 2002), the United States Court of Appeals for the First Circuit stated: "[E]xpert testimony may not be required in cases where the jury can find a design or manufacturing defect based on the testimony of the injured . . . . However, where the nature of the defect and the breach or warranty and its causal relation to the accident are complex, those issues are appropriately the subject of expert testimony." <u>Id.</u> at 453.

The Tenth Circuit, however, has not held that New Mexico law requires an expert in a products liability case.  In <u>Martin v. Unit Rig & Equip. Co.</u>, 715 F.2d 1434 (10th Cir. 1983), the Tenth Circuit concluded that under New Mexico law "causation may be established by circumstantial evidence." <u>Id.</u> at 1139.  In <u>Taylor v. Cooper Tire & Rubber Co.</u>, 130 F.3d 1395 (1997), the Tenth Circuit concluded that, under Utah law, an expert is not required in a products liability case.  In

support of that conclusion, the circuit court cited <u>Martin v. Unit Rig & Equip. Co.</u>, explaining that "[t]he developing law in other jurisdictions does not suggest an irresistible trend in the other direction which would lead Utah to change its position. It is clear that in many states circumstantial evidence, whether expert or not, may support a manufacturing defect claim." <u>Id.</u> at 1398-99.

### 4.    Alternative feasible design.

It is unclear wether New Mexico requires an alternative feasible design in order to impose liability for a design defect. <u>See</u> <u>Meil v. Piper Aircraft Corp.</u>, 658 F.2d 787, 789 (10th Cir. 1981)("New Mexico has not defined the elements for proof of strict liability for design defect and it is uncertain whether New Mexico would require proof that an alternative safer design was available in order to impose liability."). <u>See</u> <u>also</u> <u>Martin v. Unit Rig & Equipment Co.</u>, 715 F.2d 1434, 1439 (10th Cir. 1993).

### <u>ANALYSIS</u>

As the proponent of Puschinsky's testimony, the Plaintiffs have the burden of establishing that the pertinent admissibility requirements are met by a "preponderance of the evidence." <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987). The Court will first address whether Puschinsky's testimony meets <u>Daubert</u>'s requirements. The Court will then address Etnyre's motion for summary judgment.

### I.    ETNYRE'S MOTION IS TIMELY.

The Plaintiffs contend that, if the Defendants truly believed that their <u>Daubert</u> motions were valid ones, they should have filed them back in October, 2004. They argue that, if the Defendants truly believed that the Court should exclude Puschinsky, they could have requested a delay in discovery and an early ruling on the motion, because with his exclusion, the case is over. The

-22-

Plaintiffs argue that Etnyre, knowing this motion is weak and that the Court would deny it, continued with extensive litigation and took up the time and expense of everyone, including of the Court.

It may be true that the Defendants did not gain anything for their <u>Daubert</u> motions through the additional discovery that was conducted after Puschinsky's depostion. They do not rely upon any facts developed after Puschinsky's deposition. But that does not mean that the subsequent discovery is not useful to the decision of this motion. Some of the other witness' testimony may have clarified what is in dispute and what is not.

Moreover, the other discovery may have helped the Defendants determine whether to file the motion. Furthermore, the Defendants may have intentionally waited until now to file their motion, making it difficult for the Plaintiffs to replace an excluded witness. In either case, whether the Defendants waited because it needed more information or for strategic reasons, the motion is timely and made at the usual stage of the case that the Court sees <u>Daubert</u> motions. The Court will consider the motion.

## II.    <u>ANY NEW OPINIONS BY PUSCHINSKY ARE UNTIMELY.</u>

Etnyre contends that the Plaintiffs have submitted additional expert opinions regarding defective design from Puschinsky, but did so after the close of discovery. Etnyre argues that the opinions stated in Puschinsky's affidavit are new. The Court, after reviewing Puschinsky's reports and deposition, concludes that one of the opinions Puschinsky offers in his affidavit was not previously disclosed to Etnyre. The affidavit states: "The risk of hot oil erupting from the manhole cover could have been and should have been, reduced by specifying the amount of diesel and number of times diesel should be circulated in the tank." Puschinsky Aff. ¶ 11, at 4. Because that one opinion is new, the Court will disregard this opinion as untimely disclosed.

-23-

### III.    PUSCHINSKY'S TESTIMONY REGARDING NEGLIGENT OR DEFECTIVE DESIGN IS RELEVANT, RELIABLE, AND HELPFUL, AND MEETS <u>DAUBERT STANDARDS</u>.

Etnyre argues that Puschinsky may not testify at trial regarding the Plaintiffs' claims because his testimony is unreliable and is not relevant under <u>Daubert</u>.  While there are some things that Puschinsky perhaps could have done to strengthen his position in the face of this motion, Puschinsky's testimony regarding design of the Etnyre Black Topper is reliable and relevant.  The Court will admit Puschinsky's evidence.

### A.    PUSCHINSKY'S QUALIFICATIONS.

There can be little dispute that Puschinsky is an expert about something.  The question is whether Puschinsky's considerable expertise extends to the issues in this case.

Etnyre contends that Puschinsky has primarily served as a safety consultant in petrochemical refineries and as an expert in lawsuits regarding refineries, but he is not a safety engineer.  Etnyre argues that Puschinsky is not familiar with the design or manufacture of asphalt distributors, such as the Etnyre distributor or any competitor's distributors.  He has not published any studies on asphalt distributors, and he is not a member of any professional organizations.

It may be going too far to say, as the Plaintiffs assert, that the Defendants are challenging Puschinsky in his field and that a distributor is essentially a miniature processing plant.  However, this case is not concerned with the asphalt distributor truck's wheels or automotive parts, but with the processing part on the truck.  As to that part of the vehicle, Puschinsky's expertise is more on point.  If that part of the truck was a stationary object rather than on wheels, Etnyre's challenge would be considerably weaker.  He is closer to testifying in his field of safety, safe practices, and design in refineries and processing plants when the Court focuses on that part of the truck that is actually at

-24-

issue.

While the parts of the product at issue are not identical to the equipment at refineries, the Black Topper contains some basic equipment and parts that are similar, and that equipment and parts require similar care, maintenance, safety facilities, safety precautions, and operating procedures, as parts and equipment at a refinery or chemical processing plant.  Unless the Plaintiffs could locate an expert that had actual experience with Black Toppers, it would be difficult for them to find someone who knows safe operating procedures in the broad area of processing plants better than Puschinsky.  Puschinsky has also had experience with heavy construction equipment, not completely unlike the Black Topper, and specifically with machines more similar to the Black Topper, such as a vacuum truck.

Despite Puschinsky's lack of direct experience with Etnyre's Black Topper, he  is qualified to testify in this case given his education and professional background.  Puschinsky's qualifications include an education as an engineer and extensive work experience in engineering, design, and as a safety consultant.  Further, Puschinsky has taken time to examine the Black Topper twice.  He has also spoken with Morales, viewed photographs, and studied the Black Topper's maintenance and operation manuals.

The Court is convinced that Puschinsky's qualifications are adequate to be a competent and reliable guide.  He is qualified by his education, extensive work experience, and familiarity with the facts of this case.  As such, the jury, not the Court, should be left to determine the value of Puschinsky's opinions in this case.

### B.   PUSCHINSKY'S   OPINIONS   ARE   RELIABLE, RELEVANT, AND ADMISSIBLE.

Puschinsky opines that the accident was caused by Etnyre's failure to design the Black Topper to prevent fast entry of hot oil into the tank and the hot oil's contact in the tank with residue from previous use. Puschinsky also states that the operations manual does not adequately describe how to clean the Black Topper with diesel fuel. Puschinsky recommends an alternative design for the Black Topper. He suggests that it be designed with a pressure relief system that does not allow its contents to contact users. He recommends a design incorporating the use of heat sensitive valves, moving the location of the manhole cover, and changing how the manhole cover opens.

Etnyre argues that the Plaintiffs cannot carry their burden of proof to establish that Puschinsky's testimony is admissible evidence at the trial because his opinions are not reliable and not relevant. Etnyre contends that Puschinsky's opinions are largely matters provable only through his own opinions because they are not based on any objective means, testing, peer review, publication, or relevant design experience. Etnyre asserts that Puschinisky could not provide any opinions that were based on experimental, statistical, or scientific data.

"The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact." Wilson v. Muckala, 303 F.3d 1207, 1219 (10th Cir. 2002)(citing Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991)). Given Puschinsky's expertise, his knowledge of how this accident occurred, and his methodical analysis, the Court concludes that Puschinsky brings viable and relevant theories to this case that will assist the jury.

**1.     Puschinsky's methodology in reaching his opinions.**

Etnyre contends that Puschinsky did not follow generally accepted engineering methodology in reaching his opinions. In his affidavit, Patrick O'Brien, Director of Engineering for Etnyre, describes the allegedly well-recognized methodology that engineers in the field of product design

must follow before recommending a design for a piece of equipment.  O'Brien has an undergraduate

degree in Mechanical Engineering Technology and is responsible for product design on all of the

products that Etnyre manufactures.  O'Brien's duties include day-to-day supervision of the product

engineering staff, review of all product engineering work, and ultimate responsibility within the design

area for review, changes, modifications, or redesigns on any of the products that Etnyre

manufactures.  O'Brien stated that the proper methodology for a design engineer to follow must

include:

> The designer must have an understanding of how the Black-Topper's system worked
> as a whole. . . .
>
> Next the designer must frame a hypothesis.  This is nothing more, or less, than simply
> stating a fact, opinion or conclusion that can be tested or verified.  Further, the
> hypothesis must be falsifiable or refutable by others.  In design work for construction
> equipment, the hypothesis is generally that some idea, or concept will provide an
> improvement or solution to a problem encountered by the intended users of the
> equipment.  The idea or concept must be thought through and thoroughly developed
> to the point where individual parts can be designed. . . . .
>
> [T]he designer must gather data that can be used to test the hpyothesis. The
> information gathering process must utilize scientifically valid protocols which:
> > C      Follow acceptable scientific standards,
> > C      Provide for the accuracy of the date collected,
> > C      Include proper controls,
> > C      Use valid statistical methods, where appropriate,
> > C      Identify the parameters of error rate
> > C      Obviate, account for, and explain bias, and
> > C      Identify confounding variables.
>
> Once the data is collected, it must be analyzed.  A design review may be conducted
> by other engineers, manufacturers, distributors, and customers concerning the viability
> of the proposed design. . . .
>
> A testing protocol must be developed to prove the original hypothesis. Testing that
> would need to be conducted on a Black-Topper for the solution proposed by Mr.
> Puschinsky would require at minimum:
> > C      pressure testing,

C      leak testing,
C      inclement weather testing,
C      life cycle testing, and,
C      feasible replication of potential accident scenarios including
        eruption of material from manhole.

Affidavit of Patrick O'Brien ¶ 7, at 2-8, February 2, 2005.

Etnyre argues that Puschinsky's opinion is similar to the expert opinions in Kinser v. Gehl

Company, 184 F.3d 1259 (10th Cir. 1999).  In that case, the Tenth Circuit held that the trial court

should have excluded the plaintiff's expert engineers from testifying at trial.  The circuit court

concluded that the expert did not have the credentials, practical experience, or familiarization with

the product to offer expert opinions.  Moreover, the expert admitted that he did not propose a design

concept or design change without engaging in each of the steps of the well-recognized methodology

that engineers in the field of product design must follow before recommending a design for a

particular piece of equipment, in contravention of the engineering code of ethics.  In finding that the

trial court should have excluded the plaintiff's expert engineers from testifying at trial, the Tenth

Circuit stated: "Simply throwing out a concept and suggesting it may be feasible is an insufficient

basis 'for relaxing the usual first-hand knowledge requirement of the Federal Rules of Evidence on

the ground that the expert's opinion has a reliable basis in knowledge and experience of his

discipline.'" Id. at 1272 (quoting Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996)).

Unlike the expert in Kinser v. Gehl Company, Puschinsky's opinions are based on first hand

knowledge and have a reliable basis.  In his affidavit, which clarifies his deposition testimony,

Puschinsky details the process he used in formulating an opinion.  Puschinsky collected information

by examining the Black Topper twice, by studying Etnyre's maintenance and operation manuals, by

looking at photographs, and by interviewing Morales about what materials were used in the Black

-28-

Topper and how the accident occurred.  Puschinsky then formally proposed that hot AC-5 oil vaporized residue water left in the Black Topper's tank caused an increase in pressure, which ultimately caused the oil to erupt out of the manhole cover.

Moreover, Puschinsky's view of how this accident transpired is the only scenario proposed, and the Defendants do not contest that scenario.  All witnesses who have given opinions on what caused the accident have been unanimous in stating that the tank retained water-based emulsion in it when the hot asphalt was injected. See Deposition of Mark Berry at 73:20-75:12 (taken October 5, 2004)(insufficient cleaning of tank); Deposition of Hugh Davis at 33:1-37-19 (taken November 9, 2004)(condensation); Deposition of Jimmy Bingham at 22:2-10 (taken November 9, 2004). Taking into account the operator's manual, maintenance records, and the design configuration of the Black Topper, Puschinsky's evaluation that this machine was defective is credible.

**2.      Puschinsky is not required to test his opinions.**

Etnyre argues that Puschinsky's theories regarding the Black Topper have not been tested or subjected to peer review or to publication.  There does not appear to be any dispute that Puschinsky did not test the distributor or conduct tests of similar distributors to replicate the accident.  See Puschinski Aff. ¶ 11, at 3-4.  As Kumho explains, however, this is a consideration, not a requirement.

The Tenth Circuit, in Bitler v. A.O. Smith Corp., 391 F.3d 1114 (10th Cir. 2004), explained that "testing is not necessary in all instances to establish reliability under Daubert." Id. at 1123.  The Tenth Circuit held that an expert's "personal experience, training, method of observation, and deductive reasoning" could be sufficiently reliable to constitute valid methodology.  Id. at 1122. The Court concludes that Puschinsky's methodology in reaching his opinions is credible and testing is not required.

3.      **Puschinsky has suggested alternative designs**.

There are two disputes about the alternative designs, one factual and one legal.  Etnyre contends that Puschinsky does not suggests feasible alternative designs, and that the law requires feasible alternatives.  The Plaintiffs contend that the law does not require alternatives, but nonetheless Puschinsky has suggested alternative designs.

"[I]t is uncertain whether New Mexico would require proof that an alternative safer design was available in order to impose liability." Meil v. Piper Aircraft Corp., 658 F.2d 787, 789 (10th Cir. 1981).  In any case, the Court need not decide whether an alternative safe design is required because Puschinsky has suggested alternative designs for the Black Topper.  His alternative designs include: a temperature control valve, see Puschinsky Depo. at 86:2-13; a measuring device so that one could see what liquid was left in the tank, see id. at 102:19-25; a pressure relief system or venting system; see id. at 113:19-21; locating the controls under a roof or in a cab, see id. at 115:19 - 116-4; and personal protection equipment for the operator, see id. at 116:2-6.

A review of Puschinsky's reports and deposition testimony demonstrates that, pursuant to rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharmaceuticals, Inc., his opinions are admissible.  The Court will not exclude his testimony.

## IV.   PUSCHINSKY DOES NOT OFFER TESTIMONY REGARDING MAINTENANCE AND WARNINGS.

Etnyre asserts that Puschinsky's testimony regarding maintenance and warnings is unreliable and will not assist the trier of fact.  Puschinsky offered little opinion, if any, on this issue.  The Court will not allow Puschinsky to testify regarding maintenance issues. Puschinsky also may not testify regarding any allegations that Etnyre failed to promulgate sufficient warnings.

**IV.    PUSCHINSKY'S TESTIMONY REGARDING DISTRIBUTION, SALE, AND MARKETING OF THE ETNYRE BLACK TOPPER IS UNRELIABLE AND NOT RELEVANT.**

Any testimony by Puschinsky regarding the Plaintiffs' claims of negligent or defective marketing, sale, and distribution by Etnyre's distibutor is not admissible at trial.  Puschinsky has limited experience upon which to formulate or ground his opinions as they relate to the marketing, sale, and/or distribution of the Etnyre Black Topper. While Puschinsky may have the education, training, or professional experience in design or manufacture of industrial or construction equipment to testify about the design of asphalt emulsion distributors, his experience in distribution, sale, and marketing is more limited.

Puschinsky has not conducted any analysis regarding the marketing, sale, or distribution of industrial or construction equipment. He does not have knowledge of the duties and obligations imposed on a manufacturer or distributor of industrial and construction equipment.  Puschinsky is unaware of the communications between Etnyre, Road Machinery, and the City of Hobbs regarding the marketing, sale, and distribution of this Black Topper or any other equipment.  Because of Puschinsky's admitted lack of experience and his lack of knowledge as to the specific facts in this particular case, his testimony on these issues are inadmissible under Daubert.

**V.    <u>SUMMARY JUDGMENT IS NOT APPROPRIATE.</u>**

The Court concludes that Etnyre is not entitled to summary judgment on the Plaintiffs' claims of negligent or defective design because the Plaintiffs have competent expert testimony to carry their burden of proof on their theories of liability based on negligent or defective design.  The Court is not, however, convinced that the Plaintiffs have carried their burden of showing a genuine issue of material fact on manufacture, maintenance, marketing, sale, or distribution of the Etnyre Black

Topper. The Court will grant Etnyre's motion to prohibit Puschinsky's testimony as an expert witness on these issues and grant Etnyre's motion for summary judgment on these claims.

    **A.    THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIM FOR NEGLIGENT OR DEFECTIVE DESIGN.**

Etnyre is without convincing authority to persuade the Court of its wish that the Court should exclude Puschinsky's testimony from trial on design defects. Given the flexible standard for admitting expert testimony, the policy in favor of allowing the jury to weigh the evidence, and Puschinsky's adequate qualifications and sound logical basis for his opinions on design defects, the Court will allow Puschinsky to serve as an expert over the design defect issues for which Puschinsky is prepared to give an opinion. Etnyre is thus not entitled to summary judgment on the Plaintiffs' claims of defect design, because the Plaintiffs have competent expert testimony to carry their burden of proof on their theories of liability based on negligent or defective design.

    **B.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' FOUR CLAIMS FOR NEGLIGENT OR DEFECTIVE MANUFACTURE, MARKETING, SALE, AND DISTRIBUTION.**

The Plaintiffs did not set forth specific facts showing that there is a genuine issue for trial on the issue whether the Defendants negligently or defectively manufactured, marketed, sold, or distributed the Etnyre oil distributor. The Defendants are entitled to summary judgment on the these claims

        **1.    The Defendants are Entitled to Summary Judgment on the Plaintiffs' Claim that the Defendants Negligently or Defectively Manufactured the <u>Black Topper</u>.**

The Plaintiffs have not carried their burden of proof in the form of admissible expert testimony to bring the issue to the jury regarding whether the Defendants defectively manufactured the Black

Topper to the jury.  The undisputed material facts, as Puschinsky's testimony establishes, are that he did not find any structural defect in the manhole assembly for the Etnyre distributor, and did not find any product defect or a defect in material.  See Puschinsky Depo. at 49:20-50:7, id. at 122:6-9.  And while Puschinsky's deposition testimony may be enough to resolve this issue, the Plaintiffs also did not submit competent evidence in response to the Defendants' Motion for Summary Judgment showing that the Black Topper was negligently or defectively manufactured with broken parts, insufficient welds, or was missing any component parts.  At the hearing on this motion, the Plaintiffs represented to the Court that negligent manufacture was no longer an issue in this case.  See Transcript at 48:8-10.  The Court will therefore grant summary judgment on the plaintiffs' claim that the Defendants negligently or defectively manufactured the Black Topper.

   **2.    The Defendants are Entitled to Summary Judgment on the Plaintiffs' Claim that the Defendants Negligently or Defectively Marketed, Sold, or Distributed the Black Topper.**

   The Plaintiffs have not submitted evidence or case law to support their claims that the Defendants negligently or defectively marketed, sold, or distributed the Black Topper to them.  A twice removed predecessor in interest to Road Machinery sold the Black Topper to the City of Hobbs, not to Morales or to his wife.  In addition, the Plaintiffs did not submit any evidence regarding the marketing, sale, or distribution of the Black Topper by a dealer, which is no longer in business, to the City of Hobbs before Morales worked for the City of Hobbs.  For example, the Plaintiffs did not submit any deposition testimony from the City of Hobbs that it was misled in the marketing, sale, or distribution of the Black Topper by the Defendants.  Even assuming that evidence existed that a dealer, which is not a party to this case and is no longer in business, negligently or defectively marketed, sold, or distributed the Black Topper to the City of Hobbs before the City employed

-33-

Morales, the Plaintiffs have not demonstrated that any such conduct proximately caused him to suffer injuries. At the hearing on this motion, the Plaintiffs represented to the Court that negligent or defective marketing, sale or distribution was no longer an issue in this case. See Transcript at 48:8-18. The Court will therefore grant summary judgment on the Plaintiffs' claim that the defendants negligently or defectively marketed, sold, or distributed the Black Topper.

**IT IS ORDERED** that Defendant E.D. Etnyre & Co.'s Motion to Prohibit the Opinion Testimony of Robert Puschinsky, P.E., Based Upon Daubert v. Merrell Dow Pharmaceuticals, Inc. and Motion for Summary Judgment is granted in part and denied in part. The Plaintiffs' claims for negligent and defective manufacture, maintenance, marketing, sale, and distribution of the Defendant's product are dismissed with prejudice. The Defendant's motion to dismiss the cliams for negligent and/or defective design is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Jerrald J. Roehl
The Roehl Law Firm, P.C.
Albuquerque, New Mexico

      *Attorney for the Plaintiffs*

Terry R. Guebert
Marcus E. Garcia
Valerie S. Reighard
Guebert, Bruckner & Bootes, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant E.D. Etnyre & Co.*

-34-